Filed 5/8/18 (unmodified opn. attached)

CERTIFIED FOR PARTIAL PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B279929 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA091690) |
| v. | |
| JOSEPH L. BILLINGSLEY, | **ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT** |
| Defendant and Appellant. | |

The opinion filed on May 2, 2018, and partially certified for publication, is modified as follows:

On page 25, footnote 8 is deleted. There are no subsequent footnotes.

This order does not change the judgment.

PERLUSS, P. J.          ZELON, J.          SEGAL, J.

Filed 5/2/18 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B279929 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA091690) |
| v. | |
| JOSEPH L. BILLINGSLEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hector M. Guzman, Judge. Affirmed and remanded with directions.

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Scott A. Taryle and David W. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*] Under California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part C of the Discussion, and the Disposition are certified for publication.

## INTRODUCTION

The People charged Joseph Billingsley with two counts of assault with a firearm and alleged in connection with both counts Billingsley personally used a firearm within the meaning of Penal Code section 12022.5, subdivision (a).[1] The People also charged Billingsley with shooting at an occupied motor vehicle, discharge of a firearm with gross negligence, and the attempted willful, deliberate, and premeditated murder of Devonte James. In connection with the count for attempted murder, the People alleged Billingsley personally and intentionally used and discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c). The People also alleged Billingsley had a prior conviction for a felony that was a serious felony within the meaning of section 667, subdivision (a)(1), and a prior violent or serious felony conviction within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12).

The jury convicted Billingsley on all counts and found all allegations true except the allegation Billingsley attempted to murder James willfully, deliberately, and with premeditation. The trial court declared a mistrial on that allegation.

The trial court imposed the lower term of five years for the attempted murder conviction, doubled under the three strikes law, plus five years for the prior serious felony conviction under section 667, subdivision (a)(1), and 20 years for the firearm

---

[1] Statutory references are to the Penal Code.

2

enhancement under section 12022.53, subdivision (c). The court imposed a consecutive term of two years for one of the convictions for assault with a firearm (one-third the middle term of three years, doubled), plus one year four months for the firearm enhancement under section 12022.5, subdivision (a), on that count. The court stayed imposition of the sentences on the remaining counts, including for the second firearm enhancement under section 12022.5, subdivision (a). Billingsley's aggregate sentence was 38 years four months.

Billingsley contends the trial court erred by failing to instruct the jury on self-defense and imperfect self-defense and by denying his request for a trial continuance to locate a witness. In a supplemental brief, Billingsley argues we should remand for resentencing to allow the trial court to exercise discretion to strike the firearm enhancements under the recent amendments to sections 12022.5 and 12022.53.

In the unpublished portion of this opinion, we affirm the conviction. In the published portion, we remand for the trial court to hold a new sentencing hearing under the amended statutes.

## FACTUAL BACKGROUND

A.      *The Confrontation at Billingsley's House*

On the afternoon of December 7, 2014 Myesha Milton picked up her husband James from work in her SUV. Mariah Webster and her three-year-old son rode in the back seat. Milton had called James earlier that day to tell him a man known to them as Murdock called Milton a bitch while she and Webster shopped at a liquor store. Milton drove past Billingsley's house,

which was near the liquor store, and James saw Murdock outside. Milton stopped the SUV and James got out.

James told Murdock and a group of five to seven people on the porch of the house that he "wanted fades" with everyone, meaning he wanted to fight them. Murdock went to talk with James in the street, and they spoke standing next to the SUV for several minutes. James yelled at Murdock, but never raised his fists or threatened him with a weapon. Without warning, someone fired shots, and a bullet shattered one of the SUV's windows. James began to run. He initially thought a bullet had hit him, but the bullet only grazed his shoe. Murdock fell down but was not hit.

### B. *The 911 Call*

An off-duty Los Angeles Police Department officer named Andres Sandoval and his cousin stood in a driveway that afternoon, several houses away from Billingsley's house. Officer Sandoval saw "a bunch of male blacks" get out of an SUV, and he observed at least one of them reach into his waistband as if reaching for a gun. Officer Sandoval called 911, told the operator a fight was about to occur, and asked the operator to send deputies. While still on the phone with the 911 operator, Officer Sandoval heard multiple gun shots. He initially reported a victim had been shot but later said the man got back up and ran away.

### C. *The Investigation*

Los Angeles County Deputy Sheriff Shawn Priestley and his partner responded to the scene within one minute. They did not find a gunshot victim but saw two men sitting on the porch of

Billingsley's house.  As they approached the men, the deputies found nine-millimeter shell casings in the driveway.  The men told the deputies they had just arrived at the house and did not know anything about a shooting.  As the deputies continued questioning the two men, Billingsley came out of his house wearing a blue, white, and black plaid shirt.  He too said he did not know anything about the shooting.  The deputies detained all three men.

Later that evening Deputy Priestley and two other deputies returned to Billingsley's house with a search warrant.  The deputies retrieved eight nine-millimeter shell casings and found three firearms and ammunition inside an outdoor stove on the property.  Ballistics tests later showed none of the guns found on Billingsley's property matched the shell casings.  The deputies released the two men they initially found on Billingsley's porch and took Billingsley into custody.

Billingsley consented to an interview with the deputies.  He told them he was preparing for a barbeque the afternoon of the shooting and did not hear any gunshots because a football game was on television and he was playing loud music in the house.  He only noticed the deputies talking to his friends when he went outside to smoke a cigarette.  Billingsley denied owning any firearms and said his mother and four other people lived in the house with him.

The next day, December 8, 2014, Milton and James reported the shooting.  Milton described the shooter as a dark-skinned, bald man wearing a blue, white, black, and gray shirt.  She and James identified Billingsley as the shooter from a photographic lineup.

D.    *The Trial*

Milton and James testified at trial.  Milton testified she picked up a friend of James named "Snap" before encountering Murdock.  She stated James and Snap both got out of the SUV to talk to Murdock, but no one fought.  She said James did not have a gun, and she did not know what Snap "had on him."  While the three men talked, Milton heard gunshots, looked in her rearview mirror, and saw Billingsley shooting from his yard while he was standing behind a car.  She did not see anyone else with a gun.  After a bullet hit the window of her SUV, Milton drove away.  Milton admitted that when she and James reported the shooting the next day she did not tell the deputies about Snap because she did not think his presence was "important."  She first mentioned Snap at the preliminary hearing in January 2015, 18 months before trial, but did not know his full name.

James testified Snap was not in the SUV or at the encounter with Murdock.  James said he saw Billingsley in his yard while James was talking to Murdock.  James told Billingsley he could "come from behind the fence [surrounding his yard] so we can talk, too."  James also accused Billingsley of "disrespecting" his wife.  James admitted Billingsley might have interpreted his statements as an invitation to fight.  While James was still talking to Murdock (and Milton was "cussing out" Murdock from the SUV), James heard gunshots and started running.  He did not see Billingsley with a gun, but James said Billingsley "was the only one behind the [fence] doing something, like, fishy, you know, like . . . grabbing something."  James said neither he nor Murdock had a weapon.

Webster was unavailable to testify at trial, but the People introduced her testimony from the preliminary hearing.  Webster

testified James got out of the SUV to talk to Murdock. She said James and Murdock spoke for less than five minutes, and then "next thing you know, all you heard was gunshots." She turned and saw through the back window of the SUV a bald African American man shooting, and then she ducked down to protect herself and her son. Webster said the shooter was standing behind a gate and not on the street where James and Murdock were talking.

Officer Sandoval also testified at trial. He stated he saw only one man exit the SUV, not more than one as he originally told the 911 operator. He reiterated that the man reached into his waistband, making Officer Sandoval think the man had a gun, though he never saw one. Officer Sandoval also thought the SUV was parked in a way that suggested the man was "target[ing]" someone a few houses away. Officer Sandoval stated he watched the man from the SUV walk to the middle of the intersection and shout something toward Billingsley's house, but he never saw the man fight anyone. Officer Sandoval then heard rapid gunfire. He took cover and did not see "where the gunshots were coming from or where they were going," nor could he discern whether there was more than one shooter.

Sheriff's deputies could not locate Murdock to testify at trial, and Billingsley did not testify in his defense. James refused to provide Snap's legal name until shortly before the trial began, and the trial court denied Billingsley's request for a continuance to locate Snap for trial.

## DISCUSSION

A. *The Trial Court Did Not Err by Refusing To Instruct the Jury on Self-defense or Imperfect Self-defense*

Billingsley argues the trial court erroneously refused to instruct the jury on self-defense and on attempted voluntary manslaughter based on imperfect self-defense. The trial court, however, did not err in refusing to give those instructions.

### 1. *Relevant Proceedings*

Counsel for Billingsley requested an instruction on self-defense based on Officer Sandoval's testimony that at least one of the men who got out of the SUV in front of Billingsley's house reached into his waistband as if reaching for a gun. Counsel for Billingsley argued that Billingsley was justified in defending his residence. The trial court refused to give an instruction on self-defense because such an instruction was inconsistent with Billingsley's statement to the deputies that "he never even fired a weapon." The trial court also ruled there was no substantial evidence to support a self-defense theory, but the court stated it would reconsider giving an instruction on self-defense if Billingsley "took the stand or other evidence came out supporting that position."

Counsel for Billingsley also asked the trial court to instruct the jury on attempted voluntary manslaughter as a lesser-included offense of attempted murder. The trial court denied this request as well, stating voluntary manslaughter seemed "inconsistent with the theory of the defense case" and ruling there was "insufficient evidence to support an imperfect self-defense claim or a provocation claim."

8

2. *Applicable Law and Standard of Review*

A defendant acts in self-defense when he or she actually and reasonably believes in the need to defend against imminent bodily injury or death.  (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168; *People v. Battle* (2011) 198 Cal.App.4th 50, 72 (*Battle*).)  "'If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter.'"  (*Battle*, at p. 72; see *People v. Booker* (2011) 51 Cal.4th 141, 182; *People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)

Both self-defense and imperfect self-defense "require an actual fear of *imminent* harm."  (*People v. Butler* (2009) 46 Cal.4th 847, 868; see *Battle, supra,* 198 Cal.App.4th at p. 73; *People v. Rodarte, supra,* 223 Cal.App.4th at p. 1168.)  "'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury.'"  (*Manriquez, supra,* 37 Cal.4th at p. 581; accord, *People v. Lopez* (2011) 199 Cal.App.4th 1297, 1305-1306; *Battle*, at pp. 72-73.)  "'"[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future.  *An imminent peril is one that, from appearances, must be instantly dealt with.*"'"  (*Manriquez*, at p. 581; see *In re Christian S.* (1994) 7 Cal.4th 768, 783; see also *Battle*, at p. 73 ["[a]ll the surrounding circumstances . . . may be considered in determining whether the accused perceived an imminent threat of death or great bodily injury"].)

The trial court must instruct on self-defense when "it appears that the defendant was relying on the defense, or that there was substantial evidence supportive of the defense, and the defense was not inconsistent with the defendant's theory of the case." (*Manriquez*, *supra*, 37 Cal.4th at p. 581; see *People v. Boyer* (2006) 38 Cal.4th 412, 469; *People v. Salas* (2006) 37 Cal.4th 967, 982.) A trial court must instruct on imperfect self-defense "whenever there is evidence substantial enough to merit consideration by the jury that under this doctrine the defendant is guilty of voluntary manslaughter." (*Manriquez*, at p. 581; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1066.) "'[T]he existence of "*any* evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury.'" (*People v. Moye* (2009) 47 Cal.4th 537, 553; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1263.) "''[S]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense.'''" (*People v. Valdez* (2004) 32 Cal.4th 73, 116; accord, *Williams*, at p. 1264.)

We review de novo a trial court's decision not to give an instruction on self-defense or imperfect self-defense. (*People v. Simon* (2016) 1 Cal.5th 98, 133; *Manriquez*, *supra*, 37 Cal.4th at p. 581; see *People v. Cole* (2004) 33 Cal.4th 1158, 1217 ["'[w]hether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact [and] . . . should be examined without deference'"].) In so doing, we consider the evidence in the light most favorable to the

10

defendant.  (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

        3.     *There Was No Evidence Billingsley Believed He Had To Defend Himself Against an Imminent Threat*

Billingsley contends "there was substantial, if not overwhelming, evidence that [the shooter] acted in self-defense." He points to Officer Sandoval's statement to the 911 operator that he saw a man get out of the SUV, reach for his waistband, and shout in the direction of Billingsley's house shortly before the officer heard gunfire.  Billingsley also cites testimony by Milton and James, which Billingsley contends "established . . . the shooting was in response to a perceived imminent and deadly threat."  Billingsley points in particular to Milton's testimony that James challenged everyone sitting in front of Billingsley's house to a fight and that Snap accompanied James and may have been armed.  Billingsley also notes James testified Billingsley may have interpreted James's invitation to talk as an invitation to fight.  "Perhaps most importantly," Billingsley argues, there was "no apparent motive for the shooting other than in response to what appeared to be an imminent and violent threat from James and/or Snap."

Billingsley, however, does not cite any evidence that he subjectively believed James or Snap "posed a risk of imminent peril."  (*People v. Simon*, *supra*, 1 Cal.5th at p. 133; see *Manriquez*, *supra*, 37 Cal.4th at p. 581 [instruction on imperfect self-defense not warranted where the record was "devoid of evidence" supporting the defendant's subjective fear of imminent peril].)  Billingsley's argument that he responded to "what appeared to be an imminent and violent threat" is pure

11

speculation; there is no substantial evidence to support it. (See *People v. Young* (2005) 34 Cal.4th 1149, 1200 [the trial court need not give instructions based solely on conjecture and speculation].)[2] There was no evidence from any witness suggesting Billingsley ever acted out of fear, let alone fear of imminent danger. (See *People v. Hill* (2005) 131 Cal.App.4th 1089, 1102 ["[w]hile it is true that substantial evidence of a defendant's state of mind may be found in the testimony of witnesses other than a defendant [citation], no other witness in the instant case testified that defendant acted out of reasonable fear"], disapproved on another ground in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5.) To the contrary, Billingsley told sheriff's deputies he did not shoot a gun and had no knowledge of the shooting. (See *Hill*, at p. 1102 [the record "was totally devoid of any expression of fear by defendant" where the defendant "told the police he was not involved in the shooting"].)

At most, the evidence on which Billingsley relies suggests he may have had some fear of future harm, but there is no indication Billingsley actually believed he was in imminent danger of death or great bodily injury. (See *Manriquez, supra*, 37 Cal.4th at p. 582 [no evidence the defendant actually believed he was in imminent, as opposed to future, danger, where the defendant said he "'had heard some threats'" that the victim wanted to kill him].) Thus, there was no substantial evidence to support a self-defense instruction. Because both self-defense and imperfect self-defense require a subjective fear of imminent harm

---

[2] Billingsley does not argue the trial court should have instructed the jury on self-defense because he relied on that defense at trial. (See *Manriquez, supra*, 37 Cal.4th at p. 581.)

(*Butler*, *supra*, 46 Cal.4th at p. 868), the trial court did not err in denying Billingsley's requests to instruct the jury on self-defense or imperfect self-defense.

The cases Billingsley cites are readily distinguishable.  In *People v. Elize* (1999) 71 Cal.App.4th 605 the court held the trial court erred by refusing to instruct on self-defense where "a jury could find from the evidence presented that defendant was sought out and attacked by two angry women much larger than he, that he was being beaten with pipes, that this beating accounted for his broken wrist, that one of the women tried to take his handgun, and that he struggled with that woman while the other continued to beat him." (*Id.* at pp. 615-616.)  There was no similar evidence in this case.  In *People v. Villanueva* (2008) 169 Cal.App.4th 41 the court held substantial evidence supported an instruction on self-defense where the defendant testified the victim threatened to kill the defendant earlier in the day, the defendant believed the victim was armed, and the victim attempted to run over the defendant with his van just before the defendant shot the victim through the van's window.  (*Id.* at p. 52.)  Again, there is no comparable evidence of any such imminent danger to Billingsley.[3]

---

[3]    Billingsley also cites *People v. Ceja* (1994) 26 Cal.App.4th 78, disapproved on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 91, and *People v. Viramontes* (2001) 93 Cal.App.4th 1256, for the proposition that the trial court had a duty to instruct on voluntary manslaughter even if that instruction contradicted his theory of the case.  Those cases, however, still required substantial evidence of imperfect self-defense or provocation to trigger the trial court's duty to instruct. (See *Ceja*, at p. 85; *Viramontes*, at p. 1262.)  Because there was no

B.    *The Trial Court Did Not Abuse Its Discretion in Denying Billingsley a Continuance To Find "Snap"*

1.    *Relevant Proceedings*

When James and Milton first reported the shooting on December 8, 2014, Milton did not tell the deputies she picked up Snap before they encountered Murdock. Milton first mentioned Snap on January 20, 2015, at the preliminary hearing. After that hearing, the deputies asked Milton and James to identify Snap, but Milton and James "were hesitant" to reveal Snap's identity and refused to disclose any information about Snap because they "did not want to get him involved."

On June 6, 2016 counsel for Billingsley and the prosecutor announced they were ready for trial, and the trial court set the trial to begin June 8, 2016. Following several continuances for pretrial motions, on June 9, 2016 counsel for Billingsley asked the trial court for assistance in identifying Snap. The court asked the prosecutor to produce James for questioning about Snap's identity. On the morning of June 13, 2016 James identified Snap as Trevon Brown, but he did not provide Brown's address or date of birth.

That afternoon, before jury selection began, counsel for Billingsley requested a trial continuance "based on the new information [he] just learned [that] morning" about Snap. Counsel explained: "I was given a very common name, and when

_____

substantial evidence of imminent danger in this case, we do not consider Billingsley's argument that his theory of the case at trial (that he had no knowledge of any shooting) did not relieve the trial court of its duty to instruct on imperfect self-defense.

I ran that name for conflicts, it came back with over 60 hits. . . . I'm requesting more information on this person, such as an address, date of birth, phone number. I would like some time to follow-up with this person. If the court reads the prelim[inary hearing] transcript, according to one of the witnesses who was an eyewitness, who was actually the driver of the car, she says this person whose name I just learned was present and was in the car at the time of the shooting. . . . So based on that, that's new information. I believe this is a very important witness. It's at least a percipient witness to the events. I would like more time to investigate that and find out if there is a conflict."

The People objected. The prosecutor said that, because he did not intend to call Snap as a witness, there was no conflict between the public defender's office and Snap. He conceded, however, that both he and counsel for Billingsley learned Snap's identity that morning because James had not previously revealed Snap's real name.

The trial court denied the request for a continuance. The court reasoned that Snap's identity was not information counsel had not known or could not have obtained earlier because Milton disclosed Snap's possible involvement in the incident at the preliminary hearing. The court also noted the People did not intend to call Snap as a witness, and counsel for Billingsley had not explained what information, if any, Snap had "that would be used by the defense." Counsel for Billingsley stated he had asked the prosecutor to follow up with Milton after the preliminary hearing to find out Snap's real name, but counsel did not receive that information from the prosecutor until that morning. The court again denied the request for a continuance.

2. *Billingsley Did Not Exercise Due Diligence in Attempting To Secure Snap's Attendance at Trial*

"'A motion for continuance should be granted only on a showing of good cause.'" (*People v. Wilson* (2005) 36 Cal.4th 309, 352 (*Wilson*); see § 1050, subd. (e) ["[c]ontinuances shall be granted only upon a showing of good cause"].) "To support a continuance motion to secure a witness's attendance at trial, a showing of good cause requires a demonstration, among other things, that the defendant exercised due diligence to secure the witness's attendance." (*Wilson*, at p. 352; accord, *People v. Jenkins* (2000) 22 Cal.4th 900, 1037; see *People v. Johnson* (2013) 218 Cal.App.4th 938, 942 ["'[p]articularly, when the party seeks a continuance to secure a witness's testimony, the party must show that he exercised due diligence to secure the witness's attendance, that the witness would be available to testify within a reasonable time, that the testimony was material and not cumulative'"].)

We review the trial court's denial of a continuance motion for abuse of discretion. (*Wilson*, *supra*, 36 Cal.4th at p. 352; *People v. Smith* (2016) 245 Cal.App.4th 869, 873; see *People v. Beames* (2007) 40 Cal.4th 907, 920 [a trial court abuses its discretion in denying a motion for a continuance "only when the court exceeds the bounds of reason, all circumstances being considered"].) Billingsley has the burden of establishing the trial court abused its discretion by denying the requested continuance. (See *People v. Beames*, at p. 920; *Mendez v. Superior Court* (2008) 162 Cal.App.4th 827, 834.)

"'[F]ailure to attempt to secure the attendance of a witness for whom a continuance is sought indicates a lack of due

16

diligence.'" (*Baustert v. Superior Court* (2005) 129 Cal.App.4th 1269, 1277.) Even if Billingsley had presented evidence Snap could have been available within a reasonable time to provide material, noncumulative testimony, Billingsley failed to use due diligence to identify Snap after learning at the preliminary hearing of his existence. Counsel for Billingsley told the trial court he "ask[ed] the People to follow up with [Milton or James] to find out the name of . . . Snap," but there is no evidence that, in the 18 months between the preliminary hearing in January 2015 and the start of trial in June 2016, Billingsley made any effort to learn Snap's name or locate him. No diligence is not due diligence. (See, e.g., *People v. Lewis* (2006) 39 Cal.4th 970, 1035-1036 [defendant failed to show due diligence where counsel had two years to prepare for trial, announced he was ready for trial, and then requested a continuance to locate a witness]; *Wilson*, *supra*, 36 Cal.4th at p. 352 [defendant failed to show due diligence in attempting to obtain impeachment witnesses where the defendant knew the identities of the prosecution's witnesses "long before" his request for a continuance, but did not subpoena them or prepare to have them available as rebuttal witnesses]; *People v. Henderson* (2004) 115 Cal.App.4th 922, 934 [prosecutor failed to exercise due diligence when, "aside from mailing a subpoena, nothing was done before the date of the scheduled preliminary hearing to contact the victim and secure his testimony"].)

Billingsley argues any failure to exercise due diligence "was solely attributable to the alleged victims in this case." Billingsley, however, does not explain why he did not seek the

17

assistance of the court or the prosecutor sooner.[4]  For example, the record shows counsel for Billingsley made 18 court appearances in this case between the January 2015 preliminary hearing and the June 2016 trial.  During any one of these hearings he could have requested the same assistance he received from the trial court on June 6, 2016 in questioning James about Snap's identity.

Billingsley's efforts also fell far short of the diligence the defense attorneys exercised in the cases he cites.  In *People v. Buckey* (1972) 23 Cal.App.3d 740 the trial court abused its discretion in denying a short continuance to accommodate a doctor's schedule where "the witness was clearly identified; the evidence to be offered by means of his testimony was not merely material, it was critical, and highly necessary, especially in view of the court's insistence on excluding [the defendant's] testimony on his sole defense; and the diligence shown by counsel in contacting [the doctor] that very evening, and promising his appearance for the next court day was all that could be reasonably desired." (*Id.* at p. 744.)  In *U.S. v. Flynt* (9th Cir. 1985) 756 F.2d 1352 the Ninth Circuit held the district court abused its discretion in denying a motion for a continuance of a contempt trial where the defendant, incarcerated in a different state, filed an ex parte application and two habeas petitions in

---

[4]     Indeed, in his reply brief, Billingsley acknowledges "the record is unclear [regarding] the extent to which trial counsel attempted to locate Snap, [but] any attempts to do so would have clearly been futile."  Yet it was counsel for Billingsley who ultimately set in motion the events that led James to reveal Snap's identity, which suggests earlier attempts by counsel would have been successful, not futile.

18

connection with his efforts to procure a witness, and his attorney identified three expert witnesses on the defendant's mental capacity, all of whom stated they could not perform an adequate evaluation of the defendant within the time constraints imposed by the district court. (*Id.* at pp. 1359-1360.) Billingsley did not come close to demonstrating the kind of diligence that the defendants in these cases exercised or the materiality of the absent witnesses' potential testimony that the defendants in these cases demonstrated.

Because Billingsley did not demonstrate he exercised due diligence to secure Snap's attendance at trial, he did not show good cause for a continuance. (See *Wilson*, *supra*, 36 Cal.4th at p. 352; *People v. Jenkins, supra,* 22 Cal.4th at p. 1037.) The trial court did not abuse its discretion or violate Billingsley's federal constitutional rights in denying Billingsley's request for a continuance. (See *People v. Alexander* (2010) 49 Cal.4th 846, 935; *Wilson*, at p. 352.)[5]

C.      *Billingsley Is Entitled to a New Sentencing Hearing*

When the trial court sentenced Billingsley, former section 12022.5, subdivision (c), and former section 12022.53, subdivision (h), prohibited the court from striking those enhancements, and section 12022.53, subdivision (f), required the court to impose the

---

[5]      Because the trial court did not err either in instructing the jury or in denying Billingsley's request for a trial continuance, there was no cumulative error. (See *People v. Cordova* (2015) 62 Cal.4th 104, 150 [no cumulative prejudicial error where "there was no error to accumulate"].)

19

enhancement under that statute with the longest term.[6]  (See *People v. Fuentes* (2016) 1 Cal.5th 218, 226; *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1127; *People v. Oates* (2004) 32 Cal.4th 1048, 1057; *People v. Thomas* (1992) 4 Cal.4th 206, 208, 211; *People v. Jones* (2007) 157 Cal.App.4th 1373, 1383.)  As noted, the trial court imposed the 20-year enhancement under section 12022.53, subdivision (c), on the attempted murder conviction, imposed a term of one year four months (one third the middle term of four years) on one of the assault with a firearm convictions under section 12022.5, subdivision (a), and stayed imposition of the enhancement under section 12022.5, subdivision (a), on the other assault with a firearm conviction.

The Legislature amended section 12022.5, subdivision (c), and section 12022.53, subdivision (h), effective January 1, 2018, to give the trial court discretion to strike, in the interest of justice, a firearm enhancement imposed under those two statutes.[7]  (See Sen. Bill No. 620 (2017-2018 Reg. Sess.), Stats. 2017, ch. 682, (S.B. 620) (Senate Bill 620); *People v. Watts* (Apr. 11, 2018, B270324) ___ Cal.App.5th ___, ___ [2018 WL 1737213].) The People concede sections 12022.5, subdivision (c), and

---

[6]     Section 12022.53, subdivision (f), provides:  "If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment."

[7]     Section 12022.5, subdivision (c), and section 12022.53, subdivision (h), now both provide:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

12022.53, subdivision (h), as amended, apply retroactively to Billingsley, whose sentence was not final before those provisions came into effect.  (See *People v. Watts*, *supra*, ___ Cal.App.5th at p. ___ [2018 WL 1737213 at p. 13]; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091; *People v. Robbins* (2018) 19 Cal.App.5th 660, 679.)

In a supplemental brief, Billingsley argues he is entitled to a new sentencing hearing to give the trial court an opportunity to exercise discretion to strike the firearm enhancements under sections 12022.5 and 12022.53.  The People argue Billingsley is not entitled to a new sentencing hearing because the trial court indicated it would not have stricken any firearm enhancement even if it had discretion to do so.  Billingsley has the better argument.

### 1.     *Relevant Proceedings*

At the sentencing hearing counsel for Billingsley asked the court to stay the 20-year enhancement under section 12022.53, subdivision (c).  The trial court accurately observed that, at the time, the court did not have discretion to strike or stay that firearm enhancement.  The court explained: "My understanding of [section] 12022.53, specifically [subdivision] (h), is the court has no such authority, and, quite frankly, this is not the kind of case I would stay the gun allegation.  I have no say as to the actual penalty for that particular allegation.  It's set at 20 years, but as far as staying or striking the allegation, the court does not have authority to do so, nor would it do so under the circumstances of this case."

Counsel for Billingsley then asked the court to allow Billingsley to serve the 20-year enhancement concurrently with

21

his sentence for attempted murder. The court impliedly rejected that request, stating that "unfortunately, obviously, the consequences are severe in this case." The court noted that Billingsley shot eight times in the direction of three or four people and that the evidence supported the inference that a bullet fragment or some other object propelled by gunfire struck James. The court summarized the facts of the case and described them as "tragic" and "unfortunate, in many ways, for Mr. Billingsley." The court then imposed a term of 20 years for the enhancement under section 12022.53, subdivision (c).

2. *The Trial Court Did Not Clearly Indicate It Would Not Have Exercised Its Discretion To Strike the Firearm Enhancements*

The People, citing *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 (*Gutierrez*), argue "[r]emand is not appropriate because the trial court here indicated that it would not strike a firearm enhancement, and no reasonable court would strike [Billingsley's] firearm enhancements." In *Gutierrez*, while the appeal was pending in the Court of Appeal, the Supreme Court in a different case held that trial courts have discretion to strike a serious or violent felony conviction under the three strikes law. (*Ibid.*) The Court of Appeal in *Gutierrez* held that resentencing was required "unless the record shows that the sentencing court clearly indicated that it would not, in any event, have exercised its discretion to strike the allegations." (*Ibid.*) The court in *Gutierrez* concluded remand would not serve any purpose in that case because the trial court had "stated that imposing the maximum sentence was appropriate. [The trial court] increased [the defendant's] sentence beyond what it believed was required

22

by the three strikes law, by imposing the high term . . . and by imposing two additional discretionary one-year enhancements." (*Ibid*.) Here, the record does not "clearly indicate" the court would not have exercised discretion to strike the firearm allegations had the court known it had that discretion. Although the trial court noted the facts of the case "could have been a lot worse," the court did not express an intention to impose the maximum possible sentence. The court also expressed concern the consequences for Billingsley's sentence were "unfortunate" and "tragic." (See *People v. McDaniels* (Apr. 17, 2018, A149015) ___ Cal.App.5th ___, ___ [2018 WL 1804952 p. 13] ["a remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement"].)

Moreover, although the court suggested it would not have stricken the firearm enhancement under section 12022.53, subdivision (c), even if it had that discretion, the court was not aware of the full scope of the discretion it now has under the amended statute. "'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see *id*. at pp. 1391-1392 [remand was appropriate because the record did not clearly indicate the trial court would have imposed the same sentence had it been aware of the full scope of its discretion after a change in the law].) And the trial court gave no indication whether it would exercise discretion to strike the

23

firearm enhancement under section 12022.5 if it had such discretion.

When the trial court sentenced Billingsley, section 12022.53, subdivisions (f) and (h), prohibited the court from striking the firearm enhancements under section 12022.53, and required the court to impose the 20-year enhancement under subdivision (c).  (See *People v. Gonzalez*, *supra*, 43 Cal.4th at pp. 1122-1123 ["after a trial court imposes punishment for the section 12022.53 firearm enhancement with the longest term of imprisonment, the remaining section 12022.53 firearm enhancements . . . that were found true for the same crime must be imposed and then stayed"].)  The trial court here should have the opportunity under the new law to strike the 20-year enhancement under section 12022.53, subdivision (c), or the 10-year enhancement under section 12022.53, subdivision (b), or both.  (See § 12022.53, subd. (f) [referring to "more than one enhancement . . . under this section"]; see also Assem. Com. on Pub. Safety, Rep. on Sen. Bill 620 (2017-2018 Reg. Sess.) June 13, 2017, p. 6 ["[u]nder [Senate Bill] 620, the trial court retains the ability, if not the legal obligation, to continue imposing firearm enhancements where the additional punishment is warranted"]; Sen. Com. on Pub. Safety Rep. on Sen. Bill 620 (2017-2018 Reg. Sess.) April 25, 2017, p. 7 [under Senate Bill 620 "relief would be available to a deserving defendant, while a defendant who merited additional punishment for the use of a firearm in the commission of a felony would receive it"]; cf. *People v. Robbins*, *supra*, 19 Cal.App.5th at pp. 678-679 [remand was appropriate for the trial court to exercise its discretion in deciding whether to strike one or both firearm enhancements under section 12022.53,

subdivision (d)].)[8]  The trial court should also have an opportunity to strike enhancements under section 12022.5, subdivision (a), one of which the court imposed and the other the court stayed.

---

[8]      In *People v. Almanza* (Apr. 9, 2018, B270903) ___ Cal.App.5th ___, ___ [2018 WL 1704193], the court declined to remand the matter to give the trial court an opportunity to exercise discretion under section 12022.53, subdivision (h), to strike the firearm enhancement.  The court stated "the question is whether there is any reasonable probability the trial court would exercise its discretion to strike the enhancements so as to justify remanding the matter."  (*Almanza*, at p. ___ [2018 WL 1704193 at p. 7].)  The court answered the question in the negative, concluding there was "no reasonable probability the trial court would exercise its discretion in favor of Almanza." (*Id*. at p. 8.)  As explained, we do not believe the "no reasonable probability" standard is the proper one in this situation.  The exercise of discretion is not a matter of probabilities.  (See *People v. McDaniels*, *supra*, ___ Cal.App.5th at p. ___ [2018 WL 1804952 at p. 14] [reviewing court should "allow the trial court to decide in the first instance whether these enhancements should be stricken, even when the reviewing court considers it reasonably probable that the sentence will not be modified on remand"].)

## DISPOSITION

The judgment of conviction is affirmed.  The sentence is vacated.  The matter is remanded for the limited purpose of allowing the trial court to exercise its discretion under sections 12022.5, subdivision (c), and 12022.53, subdivision (h).


SEGAL, J.

We concur:


PERLUSS, P. J.


ZELON, J.

26